# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JONI LYNN GOLDSTEIN,               )
                                    )
                    Plaintiff,     )
                                    )
            v.                      )          No. 4:17-CV-405 CAS
                                    )
NANCY A. BERRYHILL,                )
Acting Commissioner of Social Security,  )
                                    )
                    Defendant.     )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Joni Lynn Goldstein ("plaintiff") for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and 42 U.S.C. §§ 1381, et seq., respectively. Plaintiff filed a brief in support of the Complaint (Doc. 17), Defendant filed a brief in support of the Answer (Doc. 22), and plaintiff filed a reply brief (Doc. 23). Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I. Procedural History

Plaintiff protectively filed an application for DIB on November 1, 2013, and for SSI on November 14, 2013 (Tr. 72, 103, 157-58), alleging disability in both applications due to the following impairments: depression; anxiety; social anxiety; OCD (obsessive-compulsive disorder); ADHD (attention deficit-hyperactivity disorder); and obesity (Tr. at 10, 215-16). Plaintiff was fifty-four years of age when she applied for benefits. Plaintiff's claims were initially denied on

November 26, 2014, and November 16, 2014, respectively (Tr. 72, 103).  Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ") (Tr. 10, 113-14).  After a hearing at which plaintiff, represented by counsel, appeared and testified, the ALJ found plaintiff not disabled in a decision dated February 10, 2016 (Tr. 10-22).  On December 5, 2016, the Appeals Council issued a decision denying plaintiff's request for review (Tr. 1-5).  As such, the ALJ's decision stands as the final decision of the Commissioner subject to judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and asks that the matter be remanded for further administrative proceedings.

## II.  Evidence Before the ALJ

A.  <u>Disability Application Documents</u>

As stated above, plaintiff's Disability Report (Tr. 215-220) listed her disabling conditions as depression, anxiety, social anxiety, OCD, ADHD, and obesity  Plaintiff completed a Function Report (Tr. 221-31).  According to the report, plaintiff lives in an apartment with a roommate and her daily activities include feeding her cats when she gets up, taking medication and vitamins, and going back to bed.  She watches Go on the computer and watches TV.  She has been very depressed so has been sluggish and hasn't been doing daily chores like showering, taking care of herself or her living quarters.  She eats later than watches TV, and falls asleep very late (Tr. 221).  Plaintiff's roommate helps with feeding the cats and buying food and litter (Tr. 222).

Plaintiff has trouble sleeping and doesn't go to sleep until 3 a.m. to 5 a.m. because it's "hard to turn off brain - anxious." (Tr. 222).  Plaintiff does not put away her clothing which is piled up with no organization.  She has not been showering and has a lack of interest in removing the clutter

in her space (Tr. 222). Sometimes plaintiff's roommate cooks or provides food; plaintiff prepares food every other day, consisting of frozen dinner, soup, canned goods, packaged or fast food. She used to buy healthier food and enjoyed cooking previously (Tr. 223). Plaintiff runs the washer, dryer, dishwasher and cleans the areas she's in or using, but this takes days sometimes (Tr. 223). She never empties the washing machine, dryer, or dishwasher; she gets stuck and its hard to finish from beginning to end (Tr. 223). Plaintiff goes outside every one to three days because she either has no gas or just feels "out of sorts with outside world." (Tr. 224). When she doesn't go out she stays in bed (Tr. 224). Plaintiff hasn't shopped in a very long time. She gets nervous in big stores, so she shops on the internet (Tr. 224). If she goes into a store it takes an hour or more because she gets very distracted (Tr. 224). Plaintiff is able to use a checkbook but was making payment arrangements or selling things to pay bills. Sometimes she gets confused and forgets the deadline to pay under a bill arrangement (Tr. 224). Plaintiff's ability to balance her account has worsened, as she used to be able to budget but now pays for things and forgets and then is overdrawn (Tr. 225).

Plaintiff mainly watches TV and plays computer games (Tr. 225). She has stopped reading, going to movies, going outside much, and volunteering at hospice (Tr. 225). Plaintiff's social activities are limited and she does not have many friends (Tr. 225). She goes to the grocery store, gas station, church, and meetup groups, but lately has stopped going to church or group classes (Tr. 225). Plaintiff's family has mostly shunned her, don't understand her, and alienate her from holidays and gatherings (Tr. 226). Plaintiff's neighbors are not friendly and when she tries to be conversational they don't respond. Plaintiff has been verbally attacked by a few neighbors (Tr. 226). Plaintiff has difficulty kneeling, squatting, walking, completing tasks, concentrating, getting along

with others, and following instructions (Tr. 226). She can walk for a couple of minutes before she needs to rest for five minutes (Tr. 226).

Plaintiff can pay attention for "gaps of time – 5 – 30 minutes." (Tr. 226). Plaintiff can follow written instructions "okay" but if they are too detailed she gets overwhelmed and won't do it or finish (Tr. 226). Plaintiff will follow spoken instructions if she can but sometimes wouldn't follow through if she felt confused or ashamed (Tr. 226). Plaintiff has a problem with authority at times, she doesn't like loud voices and when she doesn't agree with rules, she yells, obsesses, or shuts down (Tr. 227). Plaintiff has been fired from jobs because of problems getting along with other people because she gossiped, snitched on boss and co-workers, didn't following rules or guidance, was tardy, and crossed boundaries (Tr. 227). Plaintiff does not handle stress or changes in routine well (Tr. 227). Plaintiff has unusual fears of crowds, and obsessive holding on to past thoughts or replaying scenarios (Tr. 227). In a narrative section, plaintiff stated that her ability to fit into society seems to be escaping her, when she has gotten jobs she has a hard time being in a training group because she feels "left behind and slow." (Tr. 228) When she has spoken up about a concern at a job it "puts up a red flag" because she is either let go or she gets scared and quits, then she worries about what people think so she doesn't go back. Plaintiff sometimes feels paranoid that people in general or at workplaces don't understand her. She wants to be liked and fit in but has said inappropriate things for shock value (Tr. 228). Plaintiff has had so "many starts of jobs and relationship that have failed I feel a pattern took hold. I haven't been able to hold a job. Then I can't function financially

& spiritually, physically."[1] (Tr. 228).  Plaintiff has had to borrow money and sell items to try to live and survive (Tr. 228).

B. Treatment Records

On December 16, 2010, plaintiff began treatment with psychologist Alice Vlietstra, Ph.D. (Tr. 388).  Dr. Vlietstra noted plaintiff was "very scattered and fragmented" and "socially anxious and quite depressed" (Tr. 388).  Plaintiff reported that her father died of a brain tumor when she was 17 and her brother died in 2007 due to an accident, and said both had been a source of support for her (Tr. 388).  Plaintiff reported difficulties relating to her mother, said she was her mother's "worst nightmare," and reported being sexually abused as a child by a neighbor (Tr. 388).  On December 23, 2016, Dr. Vlietstra noted plaintiff was "easily distracted" and "gives eccentric responses often not related to task at hand," but has a "good sense of humor" (Tr. 389).  Plaintiff's relationships with family were strained and distant, and plaintiff was relying on her mother to support her, but her mother was critical (Tr. 389).  Plaintiff "wants to be out on her own rather than dependent but has very little support." (Tr. 389).  Plaintiff has "no clear idea of self" and a "poor self image," was "very depressed and yet can be humorous." (Tr. 389).

On July 7, 2011, plaintiff treated with Frances T. McKinney, M.D., Ph.D., for a new patient visit; treatment notes are generally illegible, but it was noted she was taking Zoloft and Xanax (Tr. 267-68).  Exam notes indicate plaintiff was negative for anxiety/depression and appeared pleasant and cooperative (Tr. 267).

---

[1]      Plaintiff's Detailed Earnings Query (B3D) lists approximately 130 prior employers in her work history (Tr. 162-80).

On August 11, 2011, after having treated plaintiff for almost eight months, Dr. Vlietstra provided a narrative assessment of plaintiff's depression, anxiety/panic disorder, OCD, and ADHD (Tr. 373-74). She described plaintiff as "quite talkative" and "easily distracted, it can be difficult at times to keep her focused." (Tr. 373). Dr. Vlietstra stated Plaintiff has a long history of depression and attention deficit disorder, social anxiety, and symptoms of OCD, and she finds it difficult to trust herself and express herself (Tr. 373). Plaintiff's difficulties in maintaining sustained attention were first seen in early childhood and she had frequent problems completing work at school (Tr. 373). She is physically functional but has difficulty maintaining order and cleanliness in her home (Tr. 373). Regarding social functioning, plaintiff has difficulty assessing the context for engagement and responding appropriately to meet the needs of a task, but is working on developing her social skills (Tr. 373).

Plaintiff's social difficulties interfere with her ability to maintain a job and to obtain a job, despite going on many interviews in the last two years (Tr. 373-74). Plaintiff can concentrate when she is engaged and understands the goals of a task, but other times, "she can get distracted and ramble, failing to follow through with her goals." (Tr. 374). Plaintiff has not been able to maintain a job beyond two years due to her moderate difficulties in sustained attention and in handling stress (Tr. 374). She can understand instructions but has difficulties following through when distracted (Tr. 374). Plaintiff is significantly depressed, and needs support to realize how to effectively manage stress and assess the social environment in order to appropriately respond (Tr. 374). Dr. Vlietstra diagnosed depression, social anxiety, attention deficit disorder, obsessive-compulsive tendencies, and indicated Plaintiff's Global Assessment of Functioning (GAF) level was 45 (Tr.

373-74).[2]  She opined plaintiff was motivated, highly verbal, self reflective, and will continue to need significant therapeutic support (Tr. 374).

Plaintiff attended treatment sessions with Dr. Vlietstra from December 16, 2010 through July 13, 2012, approximately on a weekly basis but with some omissions (Tr. 370-436).  The record contains handwritten treatment notes documenting plaintiff's therapy sessions and treatment goals (Tr. 370-436).  Rather than detailing clinical findings and symptoms, the therapy notes are exploratory, and focus on plaintiff's developmental history, the relationship between her adult problems and her childhood and relationship with her mother, her general family background, her current lack of social support, and her need to develop independence (Tr. 387-436).  She was counseled through her past to work through the issues that led to the development of anxiety and depression, and to further form self-knowledge and self-confidence by separating her self-worth and strengths from her negative self-perceptions (Tr. 387-436).

In addition to regular therapy notes, Dr. Vlietstra completed an assessment form roughly every three months identifying plaintiff's problems, assessing her GAF, and rating the severity of her various mental limitations.  Dr. Vlietstra consistently assessed plaintiff's GAF as 45; found plaintiff's mood disturbances (depression or anxiety), job/school performance problems, social

---

[2]      According to the Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text. Rev. 2000) (DSM-TR-IV), the GAF scale is used to report the clinician's judgment of the individual's overall level of functioning and consists of a number between zero and 1000 to reflect that judgment. See Hurd v. Astrue, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupations, or school functioning (e.g., no friends, unable to keep a job).  DSM-TR-IV at 34.  In recent years, however, the Social Security Administration and the Eighth Circuit have recognized that GAF scores have limited importance, as they "have no direct correlation to the severity requirements of the mental disorders listings."  Nowling v. Colvin, 813 F.3d 1110, 1115 (8th Cir. 2016) (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)).

problems, and her thinking/cognition/memory/concentration problems all to be "severe or severely incapacitating," and often found her impulsivity and difficulties in activity of daily living "moderate or moderately incapacitating" (Tr. 379, 381, 383, 452, 454, 459, 460, 462).

On April 6, 2012, Dr. Vlietstra noted plaintiff was looking for jobs and considering school, but stated plaintiff had a hard time following through and it was difficult for her to find consistent work and complete schooling (Tr. 435). On July 13, 2012, Dr. Vlietstra recommended that plaintiff pursue efforts to obtain disability after plaintiff reported she was dismissed from another job because of inappropriate comments, was almost without money and was dependent on others, and her mother had cut her off two months previously, and plaintiff had been going to a food pantry (Tr. 436).

On April 16, 2013, plaintiff treated with Shari Cohen, M.D., for depression and hyperlipidemia (high elevation of cholesterol and fatty acids in the blood) (Tr. 340). Reported symptoms included difficulty staying employed due to trouble interacting with other employees, very impulsive, disrupted sleep, racing thoughts, alcohol use, lack of follow through, easy distraction, and a longstanding history of poor functioning in not being able to keep a job or stay in school (Tr. 340). On examination, positive findings included overweight, tangential thought process, and impaired judgment and insight (Tr. 340). Dr. Cohen ordered lab tests and noted plaintiff was taking Zoloft and Xanax, and has a past medical history of anxiety disorder, depression, hyperlipidemia, and ADD (Tr. 340). Dr. Cohen noted she discussed the case with plaintiff's therapist, who feels plaintiff has borderline personality and bipolar disorder (Tr. 340).

On June 14, 2013, Dr. Cohen and Bruce Schmidt, M.A., cosigned an assessment of plaintiff's psychiatric problems (Tr. 351-54). They observed severe depression, severe anxiety (childhood to present), severe ADD (childhood to present), and moderate OCD (childhood to present) (Tr. 351).

Plaintiff's thought process was moderately tangential and moderately circumstantial with severe impulsivity and severe poor concentration (Tr. 351). Her behavior was moderately paranoid, moderately to severely depressed, severely distracted, and showed severely poor impulse control (Tr. 351). In a narrative statement, they described plaintiff as follows:

> [She] has difficulty maintaining order and cleanliness in her home. [She] has poor social skills [and] is very impulsive, she is very distracted, cannot sustain attention or focus, is moderately paranoid. During interview has flight of ideas; concentration [and] persistence/pace are poor. She has repeated deterioration in work like settings (since adolescence to current). [She] should be evaluated for handling her own funds due to impulsivity. Cannot sustain work related functions.

(Tr. 351). Plaintiff's formal thought was not intact because she was impulsive/distractable (Tr. 351). She could not perform the Serial Sevens test because she could not focus (Tr. 352). Her appearance was disheveled, she made poor eye contact, and her overall mental status was "moderately impaired." (Tr. 352). Her "risk factors" included suicidal ideation and inconsistent impulse control, and alcohol use was noted (Tr. 352). Her past psychiatric treatment showed a history of depression, social anxiety, OCD, ADD, low self-esteem, poor attention, and poor concentration (Tr. 352). Plaintiff was noted to be taking Zoloft daily for depression (Tr. 352). Her home functioning was poor, she was supported financially by family, she had poor social supports, was unable to hold a job, and had poor organization skills (Tr. 352-53).

Dr. Cohen and Mr. Schmidt diagnosed plaintiff as having major depressive disorder (DSM-IV-TR 296.31), social phobia (DSM-IV-TR 300.23), and ADHD (predominately inattentive type) (DSM-IV-TR 314.00), and assessed plaintiff's GAF as 43 and her highest GAF during the previous 12 months as 43 (Tr. 353). On a functional assessment, Dr. Cohen and Mr. Schmidt identified that plaintiff can perform activities of daily living, though marginally at times; she is unable to comprehend and follow instructions due to "poor follow through"; she is unable to perform simple

and repetitive tasks due to poor sustained concentration and persistence in tasks; she is unable to maintain an appropriate work pace due to "poor follow through – distracted"; and she is unable to relate appropriately to others beyond giving and receiving instructions due to poor social skills (Tr. 353). They concluded plaintiff's psychiatric symptoms impair her ability to perform primary job tasks effectively due to a history of instability and inability to maintain employment (Tr. 353).

On February 5, 2014, Dr. Vlietstra completed an updated narrative summary of plaintiff's depression, anxiety/panic disorders, OCD, and ADHD (Tr. 370). Her description of plaintiff as easily distracted, difficult to remain focused, and unable to properly assess social situations and respond appropriately remained unchanged (Tr. 370-71). Dr. Vlietstra described plaintiff has having severe social anxiety that made it difficult for her to maintain a job; plaintiff has left positions when she feared conflict would arise, and despite repeated interviews has been unable to obtain consistent employment for the last four years despite repeated interviews (Tr. 371). Plaintiff started going to massage school but she could not complete it due to social anxiety (Tr. 371). Dr. Vlietstra opined plaintiff can understand simple instructions but has difficulties following through; she has poor ability to sustain concentration and persistence in tasks, as demonstrated by her inability to maintain a job or complete school; she is severely depressed, and has had difficulties setting boundaries and maintaining a job due to her social anxiety and distractibility (Tr. 371). Dr. Vlietstra diagnosed depression, social anxiety, attention deficit disorder, obsessive-compulsive tendencies, and indicated plaintiff's highest level of functioning (GAF) was 45, although "she can be motivated, highly verbal, and somewhat self reflective" but "needs significant support" (Tr. 371).

On February 10, 2014, plaintiff presented to Alan R. Spivack, M.D., for a consultative examination (Tr. 439). She reported she was last employed six months prior at PetSmart but lost

the job because of absenteeism (Tr. 439). She complained of depression/anxiety, social anxiety, ADHD, OCD, and being overweight (Tr. 439). Dr. Spivack noted he would assess plaintiff's physical problem with her weight, but deferred to the psychologist for the remainder of plaintiff's issues (Tr. 439). Dr. Spivack noted plaintiff was taking anti-depressant and anti-anxiety medications Trazodone, Zoloft, and Xanax (Tr. 439). On examination, she was 5'5" tall and weighed 235 pounds (Tr. 440). Physical examination was otherwise normal, and the impression was obesity, prediabetes, hyperlipidemia, anxiety, ADHD, and depression (Tr. 440-41).

On February 10, 2014, plaintiff underwent a consultative psychological evaluation with Kimberly Buffkins, Psy.D. (Tr. 447). Plaintiff reported seeing therapist Bruce Schmidt, M.A. on and off for five years, and was currently following up with him at least once per month (Tr. 447). Plaintiff reported being diagnosed with ADD and social anxiety as an adult, and being prescribed Xanax and Zoloft off and on since 1990 (Tr. 447). Plaintiff reported problems with depression "on and off [her] whole life" but reports being able to brighten and be funny (Tr. 447-48). Plaintiff smiled and used appropriate humor in interview and reported current depression began since brother died in 2007 (Tr. 448). Reported symptoms include anhedonia, social isolation, difficulty sleeping, and anxiety being around other people and big groups (Tr. 448). Her then-current medications included Xanax, Trazodone, Zoloft, and Metformin (Tr. 448). Plaintiff reported having a temp job within the past three months and was looking for employment; she reported prior work as a part-time dog food demonstrator; bartender; hairdresser; specimen processor for two years; and front desk attendant for a dermatologist's office from 2004-2006 (Tr. 448).

On examination, Dr. Buffkins noted plaintiff's appearance was remarkable for being mildly unkempt and overweight with disheveled hair; her conversation was tangential and she was quite

talkative; her thought process and content were normal (Tr. 449). Plaintiff was alert, cooperative and calm, presented with appropriate mood and affect, and had good eye contact (Tr. 449). She noted that plaintiff gets grants to pay utilities, receives food stamps, and her mother pays her rent (Tr. 450). Plaintiff cooks, does household chores, grocery shops, drives sometimes, reads sometimes, watches TV, and uses the computer (Tr. 450). Plaintiff reported getting along with her mother and being estranged from her siblings; reported having a few friends, and getting along with people in general (Tr. 450). Plaintiff's appearance and ability to care for personal needs was fair, and plaintiff's concentration, persistence, and pace was adequate during the course of the evaluation (Tr. 450). Plaintiff's GAF was assessed at 65-70.[3] Dr. Buffkins diagnosed depressive disorder, anxiety disorder, history of alcohol use, and prior history of cocaine use (Tr. 450). She opined a fair prognosis and stated "appropriate interventions could enhance [plaintiff's] ability to maximize her potential." (Tr. 450). Because of past substance abuse history and uncertain status, she opined that plaintiff should have assistance managing supplemental funds (Tr. 450).

On February 25, 2014, State Agency psychological consultant Steven Akeson, Psy.D., reviewed the medical records of Dr. Cohen; Bruce Schmidt, M.A./Dr. Cohen; Dr. Vlietstra; Dr. Spivack; and Dr. Buffkins (Tr. 79-80); and plaintiff's Adult Function Report (Tr. 80, 221-31). Dr. Akeson opined Plaintiff has the medically determinable impairments ("MDIs") of severe affective disorder, severe anxiety disorder, and severe organic mental disorder (Tr. 79), mild limitation in activities of daily living, moderate limitation in social functioning, and moderate limitation in

---

[3]     According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. Text. Rev. 2000) (DSM-TR-IV), a GAF score between 61 and 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-TR-IV at 34.

maintaining concentration, persistence, or pace (Tr. 79).  Dr. Akeson also stated that plaintiff has

MDIs for ADHD, depression, and anxiety, and a history of some treatment in the past including

outpatient counseling and medication (Tr. 80).  He stated that although consulting psychiatrist Dr.

Buffkins did not suggest plaintiff had limitations which were more than non-severe,

> [Plaintiff] has MDIs which could reasonably cause limitations.  However, the objective findings in the MER do not support the degree of limitations alleged by [plaintiff].  Allegations are viewed as only partially credible.  [Plaintiff] does appear to have some limitations in social functioning and task complexity.  She could likely do better in mod[erately] complex settings with limited public contact.  She would likely do better with treatment. (Tr. 81).

(Tr. 80-81).

Dr. Akeson found plaintiff moderately limited in the ability to understand and remember

detailed instructions; has sustained concentration and persistence limitations; is moderately limited

in her ability to carry out detailed instructions, to maintain attention and concentration for extended

periods (Tr. 82), to work in coordination with or proximity to others without being distracted by

them, and to interact appropriately with the general public (Tr. 83).  He opined that plaintiff "retains

the capacity to acquire and retain moderately-complex instructions, and to sustain concentration and

persistence with moderately complex tasks.  [Plaintiff] can adapt to changes in moderately

demanding work settings which do not require frequent public contact."  (Tr. 83).  Dr. Akeson

identified Dr. Cohen, Bruce Schmidt, M.A., and Dr. Vlietstra as medical sources providing opinions

that were more restrictive than his findings, and as to each source stated, "The opinion is without

substantial support from other evidence of record, which renders it less persuasive." (Tr. 84).  The

only further comment he offered as to those opinions was that Dr. Vlietstra had not seen plaintiff

since 2012 (Tr. 84). Plaintiff's past relevant work was "expedited," and listed only four positions.[4]

Dr. Akeson opined that plaintiff was limited to unskilled work because of her impairments (Tr. 85),

identified jobs plaintiff can perform to include "dipper (any industry) 599.685-026" "gluer (any

industry) 795.687-014" and "patcher (house appl.) 723.687-010," and concluded that plaintiff is not

disabled (Tr. 86).

On March 3, 2015, plaintiff treated at South County Health Center with Tonya Little, M.D.,

to establish care for anxiety and a possible bladder infection (Tr. 505).[5] Reported symptoms

included anxiety, difficulty concentrating, excessive worry, irritability, and nervousness, with onset

of years ago (Tr. 505). Symptoms were described as severe (can't hold a job, applying for

disability) and worsening, and exacerbated by stress and financial problems (Tr. 505). Plaintiff

reported that episodes of anxiety began years ago, reported ability for only limited social contact,

that she was unable to work, and able to do activities of daily living and housework with limitations

(Tr. 505). Mental Status exam revealed anxious, agitated, hypomanic mood and affect, loose and

tangential associations, loud and pressured speech, impaired concentration, and loose, tangential,

pressured thought process (Tr. 507). Dr. Little assessed anxiety, prescribed escitalopram oxalate

(Lexapro), and provided a referral to a behavioral health clinic (Tr. 507).

Plaintiff presented to South County Health Center on March 25, 2015 for a recheck of

anxiety, and she complained of the same symptoms (Tr. 502). Her dosage of Lexapro was increased

and she was prescribed Xanax and instructed to follow up as needed (Tr. 502-03).

---

[4]     As noted above, plaintiff's Detailed Earnings Query (B3D) lists approximately 130 prior
employers (Tr. 162-80).

[5]     In the hearing transcript, "South County" is incorrectly transcribed as "Salt County."

On April 2, 2015, plaintiff presented for a behavioral health initial consultation upon Dr. Little's referral, and complained of depression and anxiety. Plaintiff reported feeling "frozen/stuck" in her life (Tr. 496). She presented as moderately depressed and anxious on examination, and Lisa VonWahlde, MSW, LCSW, found plaintiff needs counseling and psychiatric treatment to manage depressive and anxiety symptoms and life stressors (Tr. 496). She received counseling and a referral to begin behavioral health treatment (Tr. 496).

Plaintiff followed up with Lisa VonWahlde on May 7, 2015 for counseling (Tr. 489). Ms. VonWahlde noted plaintiff presented as highly tangential with pressured speech and difficulty being interrupted during consultation (Tr. 489). She recommended counseling to address mental health issues before addressing medical health issues, suggested that plaintiff shift to Family Mental Health Collaborative ("FMHC") counseling "depending on where [plaintiff] is on FMHC wait list," encouraged plaintiff to consult with a FMHC social worker, and scheduled a follow up appointment (Tr. 489).[6]

Plaintiff met with a dietician on May 15, 2015 (Tr. 485). She was observed to have difficulty focusing and staying "with one thought process." She received counseling regarding better food choices (Tr. 485).

On May 27, 2015, Plaintiff treated with Lisa VonWahlde for a counseling session, which was focused on developing rapport, problem defining, psychosocial data collection, and assessment (Tr.

---

[6]     "FMHC is a collaboration of non-profit mental health organizations with offices located throughout Sait Louis County. FMHC's primary focus is on meeting the mental health needs of children, adults and elderly in Saint Louis County. Services are offered on a sliding fee scale. FMHC Agencies include: BJC Behavioral Health, Catholic Family Services, Jewish Family & Children's Service, Lutheran Family & Children's Services and Provident Counseling." https://www.startherestl.org/mental-health.html (last visited Sept. 20, 2018).

484). Plaintiff presented as disheveled in appearance and highly tangential with pressured speech (Tr. 484). Plaintiff "vascillated [sic] between sharing thoughts, stopping thoughts to provide narration of thought process, and then assessment of [therapist's] non-verbal communication and [plaintiff's] assumptions about [therapist's] thoughts about [plaintiff]." (Tr. 484). Plaintiff "vascillated [sic] between projecting and assessing her projection." (Tr. 484). Ms. VonWahlde opined that plaintiff "appears to be highly self-critical and self-evaluative, her high cognitive functioning often becoming self-sabotaging." (Tr. 484). She noted that a FMHC counselor had scheduled an initial appointment with plaintiff for May 27, 2015 (Tr. 486).

On May 29, 2015, plaintiff presented to Dr. Sharma at Jewish Family Services for an initial psychiatric evaluation (Tr. 471). She reported she was unemployed the last year and a half and does only part time jobs here and there (Tr. 471). She reported poor sleep and frequent worrying that interferes with sleep (Tr. 471). She feels guilty that she did not make better choices in life (Tr. 471). During the day, she is lethargic and has no energy, and has to force herself to do household chores (Tr. 471). She complained of difficulty with her family, as they are not supportive and are judgmental and mean to her, especially her mother (Tr. 471). She reported first seeing a psychiatrist at 13 years old for anxiety, and later on and off was put on Celexa, Zoloft, and Prozac, which she stopped taking because of side effects (Tr. 471). She reported a history of ADD for which she was prescribed Focalin and Adderall, but she could not tolerate the medication side effects (Tr. 471). Her then-current prescriptions were Lexapro and Xanax (Tr. 471). Mental Status examination showed well groomed, good eye contact, normal speech, liner, goal-directed, and tangential thoughts, and fair insight and judgment (Tr. 471). Dr. Sharma assessed generalized anxiety disorder, depression, and borderline personality traits and prescribed Effexor to replace Lexapro (Tr. 472).

On June 3, 2015, plaintiff treated with Dr. Little for anxiety with symptoms of anxious feelings, difficulty concentrating, excessive worry, irritability, and nervousness (Tr. 482). She reported as "currently able to do activities of daily living with limitations, unable to work, able to do housework with limitations and able to have limited social contact." (Tr. 482). She was continued on medications with an increased dose of Lexapro (Tr. 482).

On August 7, 2015, plaintiff treated with Dr. Little for anxiety and risky behaviors (Tr. 476). Examination revealed anxious mood, tangential associations, lack of insight to self, lack of judgment regarding every day activities, inappropriate judgment for social situations, thought process/cognitive function reveal flight of ideas, tangential and pressured speech, and impaired concentration (Tr. 477). Dr. Little prescribed bupropion (Wellbutrin) in addition to continuing on Lexapro and Xanax (Tr. 477). Dr. Little described plaintiff's symptoms of risky behavior as including sexual promiscuity, poor judgment, and impulsiveness, with associated symptoms of anxiety, talkativeness, and disorganization (Tr. 476). Plaintiff displayed disorganized thoughts and tangential associations during the office visit (Tr. 476). Plaintiff related calling about a job she found online on craigslist, for which she was told to "come in a dress and heels for the interview," she met man at a fancy restaurant, was told the job was schedule management for "an elite escort service," and was told that on the first day, the other office person would take her to get clothing and provide her a phone. Although plaintiff called the man after she left the restaurant, as he had told her to, she did not accept the job (Tr. 476).

Plaintiff continued weekly therapy with Lisa VonWahlde from June 2015 through September 2, 2015 (Tr. 475, 479). Plaintiff missed appointments on June 19 and June 26, 2015 and was late on July 8, 2015 (Tr. 479), August 12, 2015, and September 2, 2015 (Tr. 475). Plaintiff came to the

clinic after the June 26, 2015 appointment time to explain why she missed the session (Tr. 479). On July 1, 2015, plaintiff was "upset" and "observably angered" when the front desk manager reportedly informed VonWahlde of plaintiff's arrival late, and plaintiff stated her upset was related to VonWahlde's "brevity" with her when she came on June 26 to explain why she missed that session (Tr. 479). Sessions focused on plaintiff's poor relationships and difficulties with her family members through a pattern of "explor[ing] and process[ing]" plaintiff's behaviors, thoughts and feelings (Tr. 475, 479), including discussion on August 26, 2015 about a recent job interview plaintiff had, which "examined ways in which [plaintiff] might have navigated situation differently in the future." (Tr. 475). Plaintiff often reported feeling invisible, upset, distressed, or dependent in social situations, and received assistance reflecting on her poor past responses to social situations (Tr. 479).

### C. Hearing Testimony

Plaintiff testified that she lives in an apartment with two cats (Tr. 40), her mother supports her by paying her rent, and she receives assistance for food and utilities (Tr. 41-42). She makes $50 to $100 sometimes by doing "odd jobs" such as answering surveys on the computer for food testing or TV programming, or being on a mock jury (Tr. 42).[7] She also uses the computer for Facebook and games (Tr. 42-43). Plaintiff has a hard time being honest about her disability, because she considers herself smart, but she has a hard time obtaining and keeping a job (Tr. 43-44). She had more success when she was younger and when her father was alive, obtaining a certificate for medical assistance at age 19 although it was hard (Tr. 44). She attended cosmetology school and

---

[7]     The record does not reveal how many times plaintiff participated in a mock jury, or whether any instances took place online or in person.

dropped out the first time, but went back in 1990 or 1991 when she was 31 at a different school through vocational rehab (Tr. 44-45). She started school for massage therapy in 2000 and 2012 but dropped out (Tr. 44), there was "drama" with the massage therapy with other students and plaintiff wanting to quit and thinking she was not good enough (Tr. 46). Plaintiff testified that what stops her from being able to work is difficulty working with other people: "I guess the scenario of the relationships in the job. With co-employees or maybe thinking." (Tr. 44). She recently answered an ad and started working part-time as a courier to "go to a couple police departments and make copies of crash reports and then fax them" (Tr. 45), but she only does this 15-20 hours weekly, and started so recently that she has not yet been paid (Tr. 45). Plaintiff testified "when I think about these jobs that didn't work out I get very nervous. I think that there's times on many jobs when I would get let's say hired in even as a full time, even as a temp company. I get in there and either was competitive or worried about what other people are thinking, or not fitting in. And something or other, I dug my own hole. In retrospect, you now. I just seem to need some assurance." (Tr. 45-46).

Plaintiff testified she often feels limited and will spend the day in bed feeling hopeless and ruminating on past decisions in her life and problems she has (Tr. 48-49). She has tried treatment with many different doctors and therapists over the past few years because she was convinced that she could keep working and overcome her problems (Tr. 51). She has trouble in work situations where she is distracted by other workers and what they're doing, whether they are better or faster than her, whether she understands the training and the instructions correctly, and whether she is "having to raise my hand too much" (Tr. 55). She then gets nervous and thinks she's not as good as other workers, can't focus on training and then starts "self-talking to [herself] saying 'you don't

understand this.'  And the next thing you know I'm telling jokes or doing something, I guess, deemed, deemed not fitting in or inappropriate (Tr. 55).  She then feels so self-conscious she won't go back or she's being asked why she's breaking down like this or why she's causing a problem for herself (Tr. 55-56).  She has had trouble being appropriate in the work environment and controlling her emotions, and has been told she causes problems for herself (Tr. 55-56).  She generally has trouble fitting in to work environments and with coworkers and is fired (Tr. 57).

Plaintiff thinks she would get along with other people on the job, but she's not focused on the task in front of her (Tr. 58).  She's "more worried about being friends with them or what they're thinking of [her]." (Tr. 58).  Plaintiff's siblings and other people in her family have "written [her] off and [she's] not involved with them.  At Thanksgiving, I'm not invited and I'm kind of shunned on that – they deem me as a big, fat, loser and so, I kind of –" (Tr. 58).

Plaintiff does her household chores, but she has a vacuum cleaner she got several months ago which is still in the box because she hasn't put it together.  "And I need to vacuum.  It's like there's clutter.  There's things." (Tr. 59).  Plaintiff has a washer and dryer in her apartment but her "clothes are all over the front room.  Never make it to the back room." (Tr. 59).  Plaintiff goes grocery shopping some, "but less days going.  I just kind of – at the last minute I go.  And then when I get my food stamps I'm able to go.  But I try to go when it's not real crowded." (Tr. 59).  Plaintiff has a driver's license (Tr. 59).  Plaintiff keeps trying to get jobs because she keeps thinking she can do it (Tr. 60).

D.  Vocational Expert Testimony

The Vocational Expert testified that a hypothetical individual with plaintiff's age, education, and work experience, with the limitations that she should have (1) occasional to no direct interaction

with the public, (2) casual and infrequent interaction with co-workers, provided no tandem tasks, and (3) only occasional interactions with supervisors, could not perform any of plaintiff's past work because those jobs involved contact with the public (Tr. 64-65).

The Vocational Expert testified the hypothetical individual could perform unskilled, medium work as a linen room attendant, kitchen helper (dish washer), or floor waxer (Tr. 64-65). If the individual were to be off task fifteen percent (15%) of the time or more, work would be precluded (Tr. 66-67). The maximum absences allowable per year would be ten working days (Tr. 67). If the individual could not sustain concentration on routine, repetitive tasks for two-hour consecutive time periods, allowing being off task ten percent (10%) of the time, she could not sustain work (Tr. 69).

E. <u>Third-Party Statement</u>

Plaintiff's mother, Carla Goldstein Weintraub, submitted a written statement to the ALJ (Tr. 20, 37, 70, 259-61). The narrative statement explains that beginning at age 16, plaintiff exhibited a pattern of behavior and experiences very different from her three older siblings, with complaints from school about academic progress as well as negative behaviors (Tr. 260). Plaintiff dropped out of high school and later obtained a GED (Tr. 260). From that time forward, Ms. Weintraub sought help for plaintiff from psychiatrists, psychologists, and social workers, but plaintiff never stayed in treatment long enough to show a change in her behavior, and plaintiff often would not take prescribed medication (Tr. 260). From time to time, plaintiff would show some improvement and was able to hold down a few jobs for a short period of time, but was eventually terminated because of her lack of personal boundaries and impulsivity (Tr. 260). In the past, plaintiff was able to obtain jobs, but could not keep them (Tr. 260). Plaintiff has struggled to feel accepted by family and friends, has a love/hate relationship with Ms. Weintraub, and most shared family events with

plaintiff end with angry outbursts or plaintiff walking out (Tr. 260). As a result, plaintiff is no longer included in family activities with her mother or siblings (Tr. 260). Plaintiff's father, who she felt close to and accepted by, passed away when she was 20, and her oldest brother who she respected and admired died four years previously, and these events may have exacerbated plaintiff's behaviors (Tr. 260). Ms. Weintraub continues to pay plaintiff's apartment rent, car insurance, and other necessary bills outside of what plaintiff receives from different government programs (Tr. 261). She states that many of plaintiff's therapists suggested plaintiff apply for disability benefits as early as 2005 (Tr. 261). Ms. Weintraub states she has often had to remove herself from contact with plaintiff for her own health (Tr. 261).

### III. Decision of the ALJ

The ALJ determined that plaintiff has not engaged in substantial gainful activity since December 31, 2010, the alleged onset date (Tr. 12). The ALJ found that plaintiff has the following severe impairment: depression (20 CFR 404.1520(c) and 416.920(c), but that no impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (Tr. 13). The ALJ determined plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the nonexertional limitations that she is limited to occasional to no direct interaction with public, casual and infrequent interaction with co-workers with no tandem tasks, and occasional interactions with supervisors (Tr. 17)

The ALJ determined plaintiff is able to maintain concentration, persistence, and pace for two-hour periods with regular breaks, and may rarely be off task, but no more than five percent of the time off task (Tr. 17). The ALJ found that plaintiff has no past relevant work as she has

performed work in the past but has not earned income that equaled or exceeded the regulatory amount for substantial gainful activity (Tr. 21). The ALJ found there are jobs that exist in significant numbers in the national economy that plaintiff can perform, including linen room attendant (DOT #222.387-030), kitchen helper (DOT # 318.687-010), and floor waxer (DOT #381.687-034) (Tr. 21-22). Thus, the ALJ found that plaintiff has not been under a disability from December 31, 2010, through the date of the decision, February 10, 2016 (Tr. 22).

## IV. Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." Id. "'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If

the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity ("RFC"). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find

it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617. Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Masterson v. Barnhart, 363 F.3d 731, 736 (8th Cir. 2004). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022.

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

## V. Discussion

In her appeal of the Commissioner's decision, plaintiff raises several issues. First, Plaintiff argues the ALJ erred at Step 2 of the sequential analysis by failing to assess the severity of all of plaintiff's documented medically determinable mental impairments including social anxiety, ADD/ADHD, and OCD, instead finding only her depression severe and discussing non-severe physical impairments. (Tr. 12-13) Plaintiff also argues the ALJ erred in failing to give appropriate weight to the opinions of plaintiff's treating mental health professionals, Dr. Vlietstra, and Dr. Cohen and Bruce Schmidt, M.A. Plaintiff argues these errors carried through to the RFC, where the ALJ disregarded the limitations opined by the treating sources and assessed that plaintiff had fewer limitations than identified in the record. Plaintiff also argues the ALJ rejected all medical opinion evidence in assessing plaintiff's limitations in concentration, persistence, and pace, and instead improperly substituted her lay interpretation of the medical data for that of the qualified experts.

### A. Error at Step 2 of Sequential Evaluation

The ALJ concluded in her decision that plaintiff's only "severe" impairment is depression. The ALJ also discussed plaintiff's physical impairments, but ignored the presence of her other mental diagnoses. The evidence in the record shows that plaintiff has been diagnosed with multiple mental impairments. Dr. Vlietstra treated plaintiff regularly from at least December 2010 through approximately July 2012, and based on the extensive interaction she had with plaintiff, diagnosed her with depression, ADD, social anxiety, and OCD. The ALJ neglected to discuss the severity of plaintiff's documented ADD, social anxiety, and OCD.

Bruce Schmidt, M.A., conducted a psychological assessment of plaintiff on June 14, 2013. Based on the evaluation, he diagnosed plaintiff with major depressive disorder, social phobia,

ADHD (primarily inattentive type), and OCD, in an assessment co-signed by Dr. Cohen. The ALJ did not address the severity of plaintiff's social phobia, ADHD, and OCD.

Dr. Sharma examined plaintiff on May 29, 2015, and diagnosed her with generalized anxiety disorder (primary). Dr. Tonya Little, M.D., examined plaintiff on June 3, 2015, and diagnosed her with anxiety. Consulting psychologist Dr. Buffkins diagnosed plaintiff with depressive disorder and anxiety disorder, and consulting psychologist Dr. Akeson opined that plaintiff has medically determinable impairments of severe affective disorder, severe anxiety disorder, severe organic mental disorder, ADHD, depression, and anxiety. The ALJ did not address the severity of plaintiff's anxiety disorder.

Despite the medical evidence from treating sources of multiple psychiatric impairments in addition to depression, the ALJ did not discuss the presence, severity, or limiting effects of these conditions at step 2 of the sequential evaluation. Social Security Ruling 96-3p directs the ALJ to address the severity of every documented medically determinable impairment. The ALJ's error led to further mistakes at step 5 when she assessed plaintiff's RFC.

B. Failure to Give Appropriate Weight to Findings and Opinions of Treating Sources

When evaluating opinion evidence, an ALJ is required to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The Regulations require that more weight be given to the opinions of treating physicians than other sources and, indeed, that a treating physician's assessment of the nature and severity of a claimant's impairments be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2); see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see. Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (citing Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999)).

### 1. Dr. Vlietstra's Opinions

In her written decision, the ALJ accorded "little" weight to Dr. Vlietstra's opinions for the reasons that her description of plaintiff's symptoms and assessed GAF score of 45 are not consistent with the remaining medical records, and are not consistent with plaintiff's ability to pursue a "varied education over the years," live independently, and participate in activities including odd jobs.

The ALJ failed to consider the factors set out in §§ 404.1527(c) and 416.927(c) in determining what weight to accord the opinion of this treating psychologist, who plaintiff visited regularly for approximately twenty months. Dr. Vlietstra described plaintiff as having significant social anxiety that causes difficulty in maintaining a job. Dr. Vlietstra opined plaintiff can understand instructions but has difficulties following through; she has poor ability to sustain concentration for tasks; she is severely depressed, and has had difficulties setting boundaries and maintaining a job due to her social anxiety and distractibility. Dr. Vlietstra diagnosed depression, social anxiety, attention deficit disorder, obsessive-compulsive tendencies. The ALJ did not provide good reasons to discount this opinion evidence.

Plaintiff's "varied education" all generally occurred well in advance of the alleged onset date of disability. Plaintiff's ability to obtain a GED without special education and her achievement of a medical assistance certificate at age nineteen have no bearing on her limitations during the relevant period, as the majority of plaintiff's courses were completed decades before the alleged onset date in 2010 when she was over fifty years of age. The only education attempt that occurred during the relevant period is plaintiff's failed attempt at massage school in 2012. Dr. Vlietstra opined that plaintiff's inability to complete the massage course supports her claim of disability; plaintiff was unable to continue despite her motivation and efforts to further her education and obtain work, and she is inhibited by her severe social anxiety. Plaintiff's early educational achievements therefore do not support the ALJ's discounting of Dr. Vlietstra's opinions.

The ALJ also failed to logically connect plaintiff's ability to "live independently" and complete odd jobs with any sound reasoning for discounting Dr. Vlietstra's opinion. Dr. Vlietstra acknowledged plaintiff's attempts to obtain a job but noted that she repeatedly failed in interviews.

The record, including plaintiff's work history, shows that plaintiff has attempted many jobs over the years, but has not been able to keep a job for any length of time during the adjudicative period. Dr. Vlietstra's opinion also acknowledged that plaintiff lives somewhat independently, but struggles to maintain order and cleanliness in her home. Her records rate plaintiff's ability to care for daily activities as moderately or severely limited. This is consistent with Dr. Cohen/Mr. Schmidt's assessment that plaintiff's ability to perform activities of daily living is "marginal at times," as discussed below. Further, plaintiff has always relied on significant financial support from her mother, and therefore is not independent. This aspect of the ALJ's reasoning does not show that Dr. Vlietstra's opinion is unsupported by the record.

The ALJ failed to point to any evidence contradicting Dr. Vlietstra's opinion, and her conclusory statement is undermined by the evidence which supports Dr. Vlietstra's assessment, including her own treatment notes and periodic assessments of plaintiff's functioning. In addition, Dr. Vlietstra's opinion is consistent with the opinion and assessment of Dr. Cohen/Mr. Schmidt. Here, the ALJ failed to articulate any good reason for not assigning controlling weight to the treating physician's opinion, and also failed to consider the regulatory factors in evaluating the weight to accord to the opinion. For instance, the ALJ failed to note that Dr. Vlietstra's long-standing treatment relationship with plaintiff lends significant weight to her opinion, because she provided regular therapy and extensively interviewed and examined plaintiff during their sessions. See 20 C.F.R. § 404.1527(c)(2)(i), (ii).

The ALJ also concluded that plaintiff is not disabled because she "has little and sporadic treatment," "has not received ongoing mental health treatment," and the "record suggests she only recently sought and received some treatment in an effort to establish disability." (Tr. 19). The record

shows, however, that plaintiff was taking anti-depressant and anti-anxiety medications since at least early 2011, and received regular, ongoing psychiatric care from Dr. Vlietstra for over eighteen months, after which Dr. Vlietstra recommended that plaintiff pursue disability when she did not show improvement. Plaintiff also sought mental health treatment from Dr. Cohen/Bruce Schmidt, Dr. Little, Lisa VonWahlde, and Dr. Sharma.

For these reasons, the ALJ improperly discounted Dr. Vlietstra's opinion. This was error, because Dr. Vlietstra's opinion contains significantly greater limitations than the ALJ included in the RFC. Because the opinion is consistent with the evidence of record and was completed by an acceptable medical source, this matter will be remanded for reevaluation of plaintiff's maximum residual functional capacity.

### 2. *Dr. Cohen/Bruce Schmidt, M.A.'s Opinion*

On June 14, 2013, Dr. Cohen and Bruce Schmidt, M.A., cosigned an assessment of plaintiff's psychiatric problems. They observed severe depression, severe anxiety, severe ADD, and moderate OCD. Plaintiff's thought process was moderately tangential and circumstantial with severe impulsivity and poor concentration. Her behavior was moderately paranoid, moderately to severely depressed, severely distracted, and showed severely poor impulse control. The GAF score assigned was 43 presently and highest in the past year. In a narrative statement, they described plaintiff as follows:

> [She] has poor social skills [and] is very impulsive, she is very distracted, cannot sustain attention or focus, is moderately paranoid. During interview, has flight of ideas; concentration [and] persistence/pace are poor. She has repeated deterioration in work like settings (since adolescence to current). [She] should be evaluated for handling her own funds due to impulsivity. Cannot sustain work related functions.

Plaintiff could not perform the Serial Sevens test due to lack of focus. Her appearance was disheveled, she made poor eye contact, and her overall mental status was "moderately impaired." Her "risk factors" included suicidal ideation and inconsistent impulse control, and alcohol use was noted. She has poor social supports, is unable to hold a job, and has poor organization skills. On a functional assessment, Dr. Cohen and Mr. Schmidt identified that plaintiff can perform activities of daily living, though marginally at times; she is unable to comprehend and follow instructions due to "poor follow through"; she is unable to perform simple and repetitive tasks due to poor persistence in tasks and sustained concentration; she is unable to maintain an appropriate work pace due to "poor follow through–distracted"; and she is unable to relate appropriately to others beyond giving and receiving instructions due to poor social skills. Plaintiff's psychiatric symptoms impair her ability to perform primary jobs tasks effectively due to a history of instability and inability to maintain employment.

The ALJ briefly considered and discounted this opinion "first because it is not wholly consistent with the claimant's overall medical records and second, because it comes courtesy of a non-accepted medical source." Neither of the ALJ's reasons for rejecting the opinion are consistent with the record.

First, regarding the source of the opinion, the ALJ failed to acknowledge that it was completed by Mr. Schmidt in conjunction with plaintiff's treating physician, Dr. Cohen. Dr. Cohen signed the opinion and provided her phone number, indicating she could be contacted for verification, clarification, or additional information. Thus, the opinion did not come "courtesy of a non-accepted medical source," as it came from plaintiff's treating physician, a medical doctor.

Second, the ALJ failed to support the contention that the opinion "is not wholly consistent with the claimant's overall records." The ALJ pointed to no evidence to support this position or which contradicts the assessment, but merely made the conclusory statement. A review of the medical evidence shows the opinion is consistent with the treatment notes and clinical observations, as well as the opinion of Dr. Vlietstra, plaintiff's other treating source.

Regarding the consistency with treatment records, Dr. Cohen and Mr. Schmidt's observations echo the clinical observations appearing throughout the record. They note tangential and circumstantial thoughts, impulsivity, poor concentration, depression, and distractibility, and find plaintiff has poor social skills, inability to sustain focus, and demonstrated flight of ideas. This is supported by the fact that, on testing, plaintiff could not perform Serial Sevens due to lack of focus, she made poor eye contact, and lacked focus during the interview. Treatment records from Dr. Cohen, Dr. Little, Dr. Sharma, plaintiff's therapist Lisa VonWahlde, and plaintiff's dietician, all document tangential thoughts, impaired concentration, and lack of focus. Dr. Vlietstra completed six quarterly assessments of plaintiff's functioning in which she consistently found plaintiff's mood disturbances/anxiety, social problems, and her thinking/cognition/memory/concentration problems "severe or severely incapacitating," and her impulsivity and difficulties in activities of daily living were often moderate.[8] Treatment notes from Dr. Cohen and Dr. Little also document impaired judgment and insight. Consistent with the assessment that plaintiff could only marginally perform

---

[8] Dr. Vlietstra's quarterly assessments were dated January 5, 2011, March 31, 2011, June 30, 2011, September 30, 2011, January 3, 2012, and March 27, 2012.

activities of daily living at times, she appeared disheveled and unkempt on multiple occasions throughout the record, although not uniformly.[9]

The opinion completed by Dr. Cohen/Mr. Schmidt is therefore consistent with the treatment notes of Dr. Vlietstra, which contain the same clinical observations noted in the opinion. Thus, during the adjudicative period, all three treating mental health professionals agreed that plaintiff was seriously impaired by multiple mental illnesses, which should cause their opinions to be more persuasive in accord with the provisions of Social Security Ruling 96-2p and 20 C.F.R. § 404.1527(c)(4). The ALJ did not discuss this evidence, and failed to point to any inconsistencies between the opinion and the record to support her rejection of the opinion.

For these reasons, the ALJ improperly discounted Dr. Cohen/Mr. Schmidt's opinion. This was error, because the opinion contains significantly greater limitations than the ALJ included in the RFC. Because the opinion is consistent with the evidence of record and was completed by an

---

[9] The Court notes that the Commissioner argues the ALJ properly gave little weight to Dr. Cohen/Mr. Schmidt's assessment because they were not actually treating physicians, having only seen plaintiff once. (See Doc. 22 at 4-5.) In determining whether an ALJ properly considered opinion evidence, however, this Court must review the analysis offered by the ALJ rather than rely solely on the post hoc rationale proffered by the Commissioner. Schmidt v. Colvin, No. 2:14-CV-44 SPM, slip op. at 30-31 (E.D. Mo. Aug. 26, 2015) (citing Neeson v. Colvin, 2013 WL 5442911, at *12 (E.D. Mo. Sept. 30, 2013); Evans v. Astrue, 2010 WL 1664973, at *10 (D. Neb. Apr. 22, 2010); May v. Astrue, 2010 WL 3257848, at *9 (W.D. Mo. Aug. 16, 2010)). "The Commissioner cannot cure an ALJ's failure to follow agency regulations by arguing the substance of the record—rather than the ALJ's opinion itself—and performing the analysis the ALJ should have conducted in the first instance." Hall v. Colvin, 2014 WL 2779342, at *9 (E.D. Mo. June 19, 2014). Because it would be improper to rely on the Commissioner's post hoc rationalization to affirm the ALJ's otherwise defective administrative decision, the Court declines to do so. See id. (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962)); see also Logan-Wilson v. Colvin, 2014 WL 4681459, at *7 (E.D. Mo. Sept. 19, 2014). In addition, Dr. Buffkins's exam notes state that plaintiff saw Bruce Schmidt, M.A. "on and off" for five years, although no treatment note to document this are in the record.

acceptable medical source, this matter will be remanded for reevaluation of plaintiff's maximum residual functional capacity.

It is unknown whether and to what extent the ALJ would have accorded greater weight to the opinion evidence rendered by Dr. Vlietstra and Dr. Cohen/Mr. Schmidt had the opinions been properly considered and evaluated in accordance with the Regulations and in conjunction with the other medical evidence of record. In the absence of such a proper evaluation, it cannot be said that the ALJ's assessment as to the severity of plaintiff's mental limitations is supported by substantial evidence on the record as a whole.

C.  Residual Functional Capacity Determination Not Supported by Substantial Evidence

The Regulations define RFC as "what [the claimant] can do" despite her "physical or mental limitations."  20 C.F.R. § 404.1545(a).  "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney, 228 F.3d at 863).  See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).  To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite her impairments. Anderson v. Shalala, 51 F.3d. 777, 779 (8th Cir. 1995).  Significantly, the RFC contemplates "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  McCoy v. Schweiker, 683 F.3d

1138, 1147 (8th Cir. 1982) (en banc), abrogated on other grounds, 524 U.S. 266 (1998). "Although it is the ALJ's responsibility to determine the claimant's RFC, the burden is on the claimant to establish his or her RFC." Buford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016) (internal citations omitted).

As previously stated, the ALJ found that plaintiff has the RFC to perform:

[A] full range of work at all exertional levels but with the following non-exertional limitations: she is limited to occasional to no direct interaction with public, casual and infrequent interaction with co-workers with no tandem tasks, and occasional interaction with supervisors. [She] is able to maintain concentration, persistence and pace for two-hour periods with regular breaks. [She] may rarely be off-task, but no more than five percent of the time when she is off task.

(Tr. 17)

Plaintiff argues the ALJ failed to include marked and severe limitations in her functioning in the RFC determination, as the ALJ disregarded the limitations opined by plaintiff's treating sources and assessed that plaintiff had fewer limitations than are identified in the record. Plaintiff further argues that in assessing her limitations in concentration, persistence, and pace, the ALJ rejected all of the opinion evidence, from treating and non-examining State Agency physicians alike, and improperly substituted her lay interpretation of the medical data for that of the qualified experts.

The Court concludes the ALJ failed to consider evidence of plaintiff's medically determinable impairments of anxiety, social anxiety, ADD/ADHD, and OCD when assessing plaintiff's RFC, as these are reflected in the records and the opinions of plaintiff's treating sources. In determining a claimant's RFC, the ALJ may not disregard evidence or ignore potential limitations. McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). Further, in rejecting the opinion evidence from the treating sources, the ALJ improperly substituted her own lay interpretation of the medical data for that of the qualified medical sources. As discussed above, plaintiff's treating

sources opined marked and severe limitations in plaintiff's functioning which the ALJ discounted for improper, unsupported reasons. In doing so, the ALJ failed to cite contrary evidence or any other functional assessment which supports the RFC determination.

Regarding plaintiff's difficulties in concentration, persistence, and pace, the ALJ's assessment of only "mild" limitations is contrary to the opinions of the treating and even the non-treating physicians.[10]  Indeed, State Agency psychological consultant Dr. Akeson opined plaintiff's limitations in concentration, persistence, and pace are at least moderate, but the ALJ rejected this opinion despite giving Dr. Akeson's opinion "great weight" in general. This issue warrants remand, because the ALJ's finding of only mild concentration limitations, and her corresponding RFC finding that plaintiff can sustain attention and concentration for two-hour periods, with no more than five percent of the time off task, is not supported by substantial evidence.

The ALJ rejected greater limitations in concentration, persistence, and pace on the basis that plaintiff "completed her general education diploma in 1975, and she did not require any special education classes."  The ALJ further notes that plaintiff earned a certificate for medical assistant, completed cosmetology school, and took classes at a local community college.  As previously

---

[10]     Concentration, persistence, or pace refers to a claimant's

> [A]bility to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.
> . . . .

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Pt. A, 12.00.C.3.

discussed, the fact that plaintiff earned a GED in 1975 has no bearing on her present alleged disability, which she asserts began in 2010. Plaintiff's ability to earn a degree 35 years prior to the onset of her alleged disability offers no insight as to how plaintiff's subsequently developed mental impairments impact her ability to sustain concentration. The same defect applies to the ALJ's reliance on plaintiff's ability to obtain a certificate for medical assistance at the age of nineteen, and her two attempts at attending cosmetology school in 1990-91 and 2000. Plaintiff's ability to concentrate enough to obtain a GED and finish a certificate decades ago, and finish cosmetology school in 2000, sheds no light on her abilities in the area of concentration, persistence, and pace during the relevant period.

The ALJ also supports her rejection of Dr. Akeson's finding of moderate limitations in concentration, persistence, and pace with her own finding of mild limitations by stating, "The claimant has short-term jobs that require the ability to focus and sustain concentration," she lives alone and cares for herself, and she uses a computer to look for jobs and use Facebook. However, the ALJ fails to support the contention that taking online surveys, looking for jobs, or using Facebook shows any significant ability to concentrate. Indeed, the ALJ merely speculates that plaintiff is able to remain focused on tasks for two-hour periods without becoming distracted, with no more than five percent of the time off task. Contradicting the ALJ's speculative assumption, the clinical evidence shows that plaintiff repeatedly demonstrated tangential thoughts, impaired concentration, and lack of focus during medical appointments and evaluations. The opinions of Dr. Cohen/Mr. Schmidt, Dr. Vlietstra, and Dr. Akeson all document moderate to severe limitations in concentration, and limitations in plaintiff's ability to care for herself. In addition, the records show plaintiff lost numerous jobs because she cannot remain focused, says inappropriate things, and

cannot take and understand directions without becoming distracted by coworkers or her own thoughts. The ALJ did not consider plaintiff's inability to complete massage school in 2012 or her work history in connection with her limitations in concentration, persistence, and pace.

Finally, the ALJ cites various medical records showing that plaintiff was distracted, could not maintain attention or concentration, and lacked insight, but concludes without support that this evidence shows only mild limitations in concentration. This conclusion is nothing more than the ALJ's opinion, which is contrary to that of the medical professionals as discussed above. As such, it does not constitute substantial evidence sufficient to contradict the assessments of medical professionals or support an RFC assessment. See Harbor v. Apfel, 242 F.3d 375 (8th Cir. 2000) (the ALJ could not properly reach a conclusion "based upon his own opinion."); see also Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) ("Instead of crediting the opinions of the mental health professionals, the ALJ substituted his own unsubstantiated conclusion concerning a mental impairment for the express diagnoses of Pratt's examining psychiatrists and psychologists. Such disregard of the record constitutes reversible error.").

For these reasons, the Court finds the ALJ's RFC determination is not supported by substantial evidence.

## VI. Conclusion

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence on the record as a whole. Because the current record does not conclusively demonstrate that plaintiff is disabled, it would be inappropriate for the Court to award plaintiff benefits at this time.

This matter will be remanded to provide the Commissioner an opportunity to properly consider and weigh the medical opinions of Dr. Vlietstra and Dr. Cohen/Mr. Schmidt as well as other opinion evidence of record. Upon reconsideration of this evidence, the ALJ shall reevaluate the severity of plaintiff's medically determinable mental impairments in accordance with the technique outlined in 20 C.F.R. §§ 404.1520a, 416.920a, and shall include in her decision the specific findings and conclusions as required by §§ 404.1520a(e)(4), 416.920a(e)(4), based upon her review of the record as a whole. In light of this reevaluation of plaintiff's mental impairments, the ALJ shall likewise reassess plaintiff's credibility in accordance with <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ shall formulate an RFC determination that includes all impairments supported by substantial evidence in the record as a whole. The ALJ must provide the vocational expert with a hypothetical question that captures the concrete consequences of plaintiff's limitations based on the evidence as a whole. The ALJ may hold a new hearing if necessary.

While the undersigned is cognizant the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, the determination is for the Commissioner to make in the first instance. <u>See</u> <u>Pfitzer v. Apfel</u>, 169 F.3d 566, 569 (8th Cir. 1999).

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** to the Commissioner under Sentence Four of 42 U.S.C. § 402(g) for further proceedings consistent with this opinion.

A separate judgment will accompany this Memorandum and Order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  25th  day of September, 2018.